**REBEL OIL COMPANY, INC., a Nevada corporation, and Auto Flite Oil Company, Inc., a Nevada corporation, Plaintiffs,**

v.

**ATLANTIC RICHFIELD COMPANY, a Pennsylvania corporation, Defendant.**

**No. CV–S–90–76–PMP (RLH).**

United States District Court, D. Nevada.

March 5, 1997.

1188

**1192**

William H. Bode, John M. Mason, Robert A. Jaffee, James W. Ludwig, Laura D. Seidman, William H. Bode & Associates, Washington, D.C., and Donald J. Campbell and John D. O'Brien, Las Vegas, NV, for plaintiffs.

Donald C. Smaltz, Leighton M. Anderson, Theodore Spanos, Smaltz & Anderson, Los Angeles, CA, and Thomas F. Kummer, Kummer, Kaempfer, Bonner & Renshaw, Las Vegas, NV, for defendant.

1. The Court has also ruled on several motions in limine to exclude expert testimony. The expert testimony at issue in those motions is only relied upon by this Court in deciding ARCO's Summary Judgment Motion to the extent that testimony was deemed admissible in this Court's previous rulings.

## ORDER

PRO, District Judge.

Presently before the Court is Defendant Atlantic Richfield Company's ("ARCO") Motion for Summary Judgment (# 617) filed on November 18, 1996.[1] Plaintiffs Rebel Oil Company, Inc., and Auto Flite Oil Company, Inc., (collectively "Rebel") filed an Opposition Brief (# 631) on December 13, 1996. ARCO filed a Reply Brief (# 636) on December 30, 1996.

### I. Factual Background[2]

The basic structure of the gasoline market in Las Vegas flows from the fact that gasoline is first produced from crude oil in Los Angeles refineries. Wholesale marketers then transport gasoline to Las Vegas storage terminals over the Cal–Nev Pipeline. Wholesale marketers sell the gasoline to retailers, who then sell the gasoline to consumers.

Rebel is a retail marketer of gasoline in Las Vegas that sells gasoline on a self-serve, cash-only basis. Rebel operates retail stations under various gasoline brand names. Rebel is also a wholesaler, shipping gasoline over the Cal–Nev pipeline for sale in the retail markets in Las Vegas. ARCO is a major driller and refiner of crude oil in Los Angeles, as well as a retail and wholesale marketer of gasoline in Las Vegas. ARCO supplies gasoline to retail stations in Las Vegas bearing the ARCO brand name.

Rebel asserts that between 1985 and 1989, ARCO executed a pricing policy in Las Vegas of charging predatory prices in an attempt to increase its market share and eventually monopolize the Las Vegas gasoline market. Rebel contends that ARCO's pricing scheme drove competitors out of the Las Vegas market, and that its own share of self-serve, cash-only gasoline sales dropped as a result.

2. This factual background is a condensed version of the extensive background given in *Rebel Oil Co. Inc. v. Atlantic Richfield Co.,* ("*Rebel I*") 51 F.3d 1421 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).

According to Rebel, once ARCO drove competitors from the market, it engaged in price gouging in order to recoup the losses from its predatory practices. It supports this allegation by alleging that ARCO's Las Vegas prices were higher than its Los Angeles prices. Rebel alleges that Las Vegas marketers had been disciplined by ARCO's behavior, and that they refused to challenge ARCO's supra competitive prices. Rebel contends that today the Las Vegas market is a disciplined oligopoly in which each oligopolist shares supra competitive profits.

## II. Procedural History

In January of 1990, Rebel filed an antitrust suit against ARCO under Section 4 of the Clayton Act, which allows private parties to sue for damages for violations of antitrust laws. Rebel sought relief under sections 1 and 2 of the Sherman Act, and under section 2 of the Clayton Act (as amended by the Robinson–Patman Act). This Court limited discovery to the issues of antitrust injury and whether ARCO had sufficient market power to charge prices above competitive levels. *Rebel Oil Co. Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1432 (9th Cir, 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). (*"Rebel I"*). This Court held that Rebel failed to put forth sufficient evidence of market power to support a jury verdict, and therefore failed to sufficiently prove antitrust injury, which is a necessary element of an antitrust claim.

Rebel appealed, and the Ninth Circuit Court of Appeals analyzed the issue of market power separately as to each of Rebel's three antitrust claims. *Id.* The Ninth Circuit Court of Appeals upheld this Court's grant of summary judgment in favor of ARCO on the Sherman Act attempted monopolization claims. *Id.* at 1443. The court reversed as to the Clayton Act claim for predatory pricing. The Ninth Circuit held that a lesser showing of market power was required for a claim of price discrimination, and that Rebel's showing of market power was enough to create a material issue of fact as to this claim. *Id.* at 1448. The court therefore reversed and remanded as to the price discrimination claim only.

## III. Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56.

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 883 (9th Cir.1982), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1305–06 (9th Cir.1982). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

If the party seeking summary judgment meets its burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968), *reh'g denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270 (9th Cir. 1979). Parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979), *reh'g denied,* 441 U.S. 968, 99 S.Ct. 2420, 60 L.Ed.2d 1074 (1979). Likewise, "legal memoranda and oral

**1194**

argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Id.*

In opposing a motion for summary judgment in an antitrust case, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 853 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 170, 133 L.Ed.2d 111 (1995), the Ninth Circuit noted that while summary judgment has historically been disfavored in antitrust cases, this may no longer be so given the *Matsushita* case.[3] *Id.* All facts and inferences drawn must. be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor*, 677 F.2d 1297, 1298 (9th Cir.1982).

Summary judgment is appropriate if a party fails to make a sufficient showing on an essential element of the case on which it would bear the burden of proof at trial. *Celotex*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Failure of proof as to such an element renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2552–53. The *Matsushita, Liberty Lobby,* and *Celotex* cases cited above establish that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination

of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2554–55. (quoting Fed.R.Civ.P. 1).

**IV. Law of the Case**

Rebel cites the Ninth Circuit Court of Appeals' decision in *Rebel I* as law of the case, arguing that it prohibits this Court from granting ARCO's current motion for summary judgment. The law of the case doctrine provides that an appellate court's decision of legal issues must be followed in all subsequent proceedings either in the same case in the trial court or on a later appeal. *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 459 (9th Cir. 1986). The only exception to the law of the case doctrine is when evidence in a subsequent trial is substantially different, controlling authority has made a contrary decision of law that applies to the issues previously decided, or the decision was clearly erroneous and would work a manifest injustice. *Id.* The law of the case encompasses both a court's explicit decisions, and those issues decided by necessary implication. *Eichman v. Fotomat Corp.*, 880 F.2d 149, 157 (9th Cir.1989).

Rebel argues that ARCO's entire motion for summary judgment must be denied based on the *Rebel I* decision. In its Opposition Brief (# 631), Rebel states that the Ninth Circuit Court of Appeals' decision held that Rebel had adduced sufficient evidence to preclude summary judgment on Rebel's price discrimination claim. (Rebel Oppo. at 15). Therefore, Rebel argues that ARCO's motion for summary judgment is "unsupportable" under controlling law of the case doctrine.

Rebel's interpretation of *Rebel I* is an overstatement of both the Ninth Circuit Court of Appeals' holding and the law of the case doctrine.[4] The law of the case doctrine

---

3. ARCO alleges that *Matsushita* creates a new summary judgment standard for antitrust plaintiffs, one in which if circumstantial evidence is as consistent with competition as with conspiracy, plaintiffs must come forth with additional evidence. However, *Matsushita* addressed a Sherman Act § 1 conspiracy, not a Robinson–Patman Act case. Therefore, this Court analyzes Rebel's claim under the traditional summary judgment

standard in light of the principles of the *Matsushita* decision.

4. Rebel's misinterpretation of the Ninth Circuit's holding in *Rebel I* is illustrated by Rebel's argument that the Ninth Circuit found that "Rebel's evidence is sufficient ... to raise a disputed question of material fact" precluding summary judgment. What the Ninth Circuit in *fact* found was that "Rebel's evidence is sufficient ... to

addresses *legal issues* decided by a court, not "observations, commentary, or mere dicta touching upon issues not formally before the Court." *Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 533 (7th Cir.1982), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983). Any issue not expressly or impliedly dealt with on appeal is open for the trial court's consideration on remand. *Beltran v. Myers,* 701 F.2d 91, 93, (9th Cir.) *cert. denied,* 462 U.S. 1134, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983). As the Seventh Circuit Court of Appeals found in *Gertz,* "It is critical to determine what issues were actually decided in order to define what is the 'law' of the case." 680 F.2d at 533. Thus, the only law of the case in the present case is the issues that were decided by the Ninth Circuit Court of Appeals in *Rebel I.*

In *Rebel I,* the court of appeals reviewed this Court's determination that Rebel failed to put forth sufficient evidence of market power to support a jury verdict on its claims under the Sherman Act sections 1 and 2, and Clayton Act section 2 (as amended by the Robinson–Patman Act). Addressing the Sherman Act claims, the Ninth Circuit held that since Rebel failed to sufficiently prove ARCO's ability to increase prices above competitive levels and sustain them for an extended period, there was no proof ARCO's alleged actions threatened consumer welfare, and therefore Rebel failed to sufficiently prove antitrust injury. *Rebel I,* 51 F.3d. at 1434. The issues of market power and antitrust injury were the only issues decided by this Court in ARCO's summary judgment motion, and they were the only issues before the Ninth Circuit on appeal.[5]

Certain other findings were necessary implications to the Ninth Circuit's holding that market power did not exist for Rebel's Sher-

man Act claims. The Ninth Circuit held that since Rebel attempted to prove its case through circumstantial evidence, a showing of market power would be met by proving three separate elements. First, Rebel must define the relevant market. In *Rebel I,* the Ninth Circuit found that the relevant market was all retail sales of gasoline in Las Vegas. 51 F.3d at 1437.[6] Secondly, a plaintiff must show that the defendant owns a dominant share of that market. The Ninth Circuit found that Rebel's evidence that ARCO owned 44 percent of the market was sufficient to meet this burden. *Id.* at 1438.

Finally, the court held that a plaintiff must show significant barriers to entry and that existing competitors lack capacity to increase output in the short run. The Ninth Circuit found that Rebel's evidence on barriers to entry was sufficient to create a genuine issue of material fact, but that there was no genuine issue as to ARCO's competitors' ability to increase output if ARCO increased prices. Because ARCO's competitors had the excess capacity to increase output if ARCO raised its prices, ARCO did not have the requisite market power to sustain Rebel's Sherman Act claims. However, since the Clayton Act required a lesser showing of market power, Rebel's evidence was sufficient to create a genuine issue of material fact on this claim, and the court remanded as to this issue.

## V. ARCO's Motion for Summary Judgment

 Three different elements of a price discrimination claim are at issue in ARCO's Motion for Summary Judgment: recoupment, damages, and below cost pricing. Rebel must provide evidence, which when analyzed in the light most favorable to Rebel,

---

raise a disputed question of material fact *as to whether ARCO achieved sufficient market power to enforce supra competitive oligopoly pricing."* (emphasis added).

**5.** In fact, in *Rebel I,* this Court limited discovery solely to the issue of whether ARCO had sufficient market power to charge prices above competitive levels. *Rebel I,* 51 F.3d at 1232. No discovery was conducted on predatory pricing, intent and collusion. *Id.*

**6.** In *Rebel I,* the court noted the relationship between the wholesale and retail markets in Reb-

el's claim. The court found that where sufficient retail outlets exist, a defendant must control output at the wholesale level to pose any real threat of monopolizing the retail market. The court stated, "In essence, Rebel must show that ARCO had monopoly power, or was dangerously close to achieving it, at the wholesale supply level." 51 F.3d at 1442. The court then went on to find that Rebel had sufficient evidence of market power to sustain its price discrimination claim. *Id.* at 1448.

creates a material issue of fact on each issue. The first two elements, recoupment and damages, are determined by the *Rebel I* decision and the law of the case doctrine. The third element, below cost pricing, is not.[7] As Rebel has failed to adequately allege below cost pricing or provide evidence of such pricing, summary judgment in favor of ARCO is appropriate.

## A. Recoupment

In *Rebel I,* the Ninth Circuit held:

[T]o hold a defendant liable for charging below-cost prices, a primary-line plaintiff must show that the predator stands some chance of recouping his losses. [*Brooke Group v. Brown & Williamson Tobacco Corp.* 509 U.S. 209, 224, 113 S.Ct. 2578, 2588–89, 125 L.Ed.2d 168 (1993) ]. Under the Clayton Act, as amended by the Robinson–Patman Act, the standard is a "reasonable prospect" of recoupment. *Id.* This requires the plaintiff to show that the predator has market power, or that he has some reasonable prospect of obtaining it.

*Id.* at 1445. The Ninth Circuit, after finding that a lesser showing of market power was necessary for Rebel's price discrimination claim, found that Rebel established a disputed issue of material fact as to ARCO's market power or reasonable prospect of obtaining market power. *Id.* at 1447. The court noted that Rebel had produced data showing that during the recoupment period, ARCO's retail gas prices were higher in Las Vegas than in Los Angeles, when adjusted for transportation costs. Rebel further produced evidence showing that ARCO's market share increased at the time it was charging allegedly supracompetitive prices. The court found that Rebel had produced evidence of significant barriers to entry in the Las Vegas retail gasoline market. The court stated that this showing was crucial, since if entry into the market easy, high profit levels in the market would bring new competitors into the market, undercutting ARCO's ability to recoup its predatory losses. *Id.* at 1447.

The Ninth Circuit Court of Appeals concluded that Rebel had produced sufficient evidence to create a disputed issue of fact as to whether ARCO had sufficient market power to maintain oligopoly pricing. Since a claim for price discrimination under the Clayton Act requires a showing of a chance of recoupment, Rebel's showing of market power was sufficient to meet this burden. Therefore, the court upheld Rebel's cause of action for price discrimination. *Id.* at 1447. The court went on to note that it was expressing no opinion on the ultimate merits of Rebel's claim. *Id.* at 1448. While Rebel might not be able to prove at trial that ARCO had a reasonable chance of recoupment, summary judgment requires only a genuine issue of material fact, and Rebel met this burden. In evaluating ARCO's current motion for summary judgment, this Court is bound by the Ninth Circuit's determination that a genuine issue of material fact exists as to ARCO's ability to recoup any such losses.

## B. Rebel's Damages

ARCO contends that it should be awarded summary judgment on the issue of Rebel's damages for two primary reasons: 1) Rebel has failed to prove a causal connection between ARCO's alleged wrongful acts and a loss of anticipated revenue, and 2) Rebel either cannot show damages at all, or it has improperly measured damages.

### 1. Causal Connection

A plaintiff in a price discrimination case must show a causal connection between the price discrimination and the injury suffered. *Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 573, 110 S.Ct. 2535, 2551–52, 110 L.Ed.2d 492 (1990). Rebel need not rule out all possible alternative sources of injury, but must show that the anticompetitive conduct was a material cause of its injury. *Dolphin Tours Inc. v. Pacifico Creative Service Inc.,* 773 F.2d 1506, 1509 (9th Cir.1985). The evidence linking the anticompetitive conduct

---

7. Below cost pricing was not an issue before the Ninth Circuit Court of Appeals in *Rebel I,* and no substantial discovery on ARCO's costs had taken place at the time of the Ninth Circuit's ruling. Upon remand, extensive discovery has occurred, and substantial new evidence concerning costs is before this Court. Therefore, even if *Rebel I* was law of the case as to below cost pricing, an exception to law of the case doctrine applies.

must be more precise than the evidence establishing the extent to which a party is damaged. *Id.* Once this is established, antitrust plaintiffs are excused from an unduly rigorous standard of proving antitrust injury. *Texaco Inc. v. Hasbrouck,* 496 U.S. at 573, 110 S.Ct. at 2551–52.

■■■■ In *Rebel I,* the Ninth Circuit Court of Appeals held that "a plaintiff alleging primary-line discrimination [8] must prove antitrust injury in the same manner that a Sherman Act plaintiff does—by showing that his injury flows from those aspects or effects of the conduct that are harmful to consumer welfare." 51 F.3d at 1445. In *Rebel I,* the court found explicitly that "Rebel may be able to demonstrate antitrust injury on this claim." *Id.* at 1448. Therefore, since the court found that antitrust injury was sufficiently shown to withstand summary judgment, the court by implication found that Rebel's injury had a sufficient nexus to the alleged anticompetitive conduct. This Court is therefore bound by law of the case to sustain Rebel's claim as to the causal connection between its injury and ARCO's alleged anticompetitive conduct.

### 2. Measurement of Damages

■■■■ When calculating lost profits, a plaintiff must provide a sufficient evidentiary base from which damages can be calculated. *See William Inglis & Sons v. Continental Baking,* (*"Inglis II"*) 942 F.2d 1332, 1340 (9th Cir.1991). In antitrust cases, as long as the fact of damage is certain, uncertainty as to the extent of that damage is not fatal to a plaintiff's case. *See Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). In light of this rule, it is not fatal to Rebel's claim for damages that Rebel's expert Clifford Beadle ("Beadle") uses hypothetical markets, and assumes retail margins calcu-

lated from prior sales would continue. Hypothetical markets are often the only way to prove damages in antitrust cases. In *Dolphin Tours,* the court approved establishing lost profits by projecting the market share the plaintiff would have had in the absence of anticompetitive conduct. 773 F.2d at 1511. There is no evidence that Rebel's estimates are so far from prior margins or that the time period from which they are derived is so different that the estimates are unduly speculative.[9] A question of fact as to these issues remains.

■■■■ ARCO also argues that Rebel has had a steady growth in profit margins throughout the alleged predation period. Assuming this is true, it is not enough to warrant summary judgment. Even assuming Rebel had high profits during the predation period, if Rebel would have had astronomical profits in the absence of anticompetitive conduct, Rebel could recover the difference.

ARCO further contends that Rebel has improperly excluded all wholesale gas sales from its damages study. It may be that at trial Rebel will be obligated to offset any damages in its retail market sales with gains in its wholesale market sales. The Ninth Circuit Court of Appeals stated in *Rebel I* that Rebel may have received some gains during the predatory period, but if it was ultimately able to prove losses resulting from anti-competitive conduct, it should not be precluded from recovery. *Rebel I* 51 F.3d at 1448 n. 19. Beadle's study is therefore sufficient to create a material issue as to whether retail losses were sustained.

■■■■ ARCO's next contention is that Beadle's use of a 6–9 cent profit margin is inappropriate. Beadle based his estimates of retail margins on a review of Rebel's actual margins prior to 1986, upon consultation with

---

8. A primary line price discrimination claim exists when the price differential is between geographical markets, as opposed to price discrimination between two purchasers. *Rebel I,* 51 F.3d at 1445.

9. At trial, Rebel would bear the burden of showing that the time period from which damages are calculated is similar to the predatory pricing period but for the impact of the anticompetitive

conduct. *Inglis II,* 942 F.2d at 1340–41. ARCO has merely alleged that Rebel has failed to show the periods were similar, but ARCO has offered no evidence that the two time periods or that the Los Angeles/Las Vegas markets are dissimilar. Since all inferences must be taken in Rebel's favor, summary judgment is inappropriate on this issue.

Rebel's experts, and upon a review of various Lundberg Price Surveys for the Los Angeles gasoline market. (Beadle Report p. 2). ARCO has not shown that these are invalid methods of determining retail margins. At trial ARCO might be able to prove that this measurement is inappropriate, or that another measurement of damages is more accurate. However, based on Beadle's database, a material issue exists as to whether the 6–9 profit margin is an appropriate measure of damages.

 Finally, ARCO contends that Beadle's calculations in scenarios B and C of his report are inappropriate as a matter of law. In his projections of Rebel's lost sales in scenarios B and C, Beadle includes stations that were sold by Rebel prior to the predatory period. Rebel alleges that these sales were necessitated by ARCO's threats of predatory pricing, and therefore they should be included as damages from ARCO's anticompetitive conduct.

The inclusion of these sales in Rebel's projections is inappropriate. Rebel cannot end-run the statute of limitations on ARCO's alleged anticompetitive conduct by including these stations in its damage calculations. The statute of limitations has expired, so there is no way to prove that ARCO acted anticompetitively, forcing Rebel to sell the stations. *See* 15 U.S.C. § 16. Since Rebel cannot prove ARCO's 1984 conduct was anticompetitive, it cannot include these sold stations in its damages calculations. Additionally, Rebel merely alleges threats, and offers no evidence that anticompetitive conduct actually occurred. Therefore, as a matter of law, the estimates based on the stations Rebel sold prior to 1984 have no valid factual basis, are unduly speculative and Rebel could not rely on them at trial.

### C. Below Cost Pricing

 In order to state a cause of action under section 2 of the Clayton Act as amended by the Robinson–Patman Act, a plaintiff bears essentially the same substantive burden as a plaintiff under the Sherman Act. *Rebel I,* 51 F.3d at 1445.[10] Rebel must show that ARCO discriminated in price between purchasers of gasoline and that this price difference tended to lessen competition or create a monopoly. 15 U.S.C. § 13(a); *see Inglis II,* 942 F.2d at 1337. Rebel may prove this by showing ARCO's anticompetitive intent. *Id.* Rebel may utilize a price/cost comparison to allege this intent, but that comparison must meet the same standard required to establish intent for an attempted monopolization claim under the Sherman Act. *Id.*

In *Brooke Group v. Brown & Williamson,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), a case decided after this Court's original grant of summary judgment in favor of ARCO, the Supreme Court held that in order to establish a primary-line price discrimination claim under the Robinson–Patman Act, a plaintiff has two prerequisites to recovery. First, the plaintiff must prove that the prices complained of are below an appropriate measure of its rival's costs. *Id.* at 222, 113 S.Ct. at 2587. Second, the plaintiff must demonstrate that the competitor had a reasonable prospect or a dangerous probability of recouping its investment in below-cost prices. *Id.* at 224, 113 S.Ct. at 2588–89.

In *Brooke Group,* the Supreme Court declined to resolve the conflict among courts regarding the appropriate measure of cost in predatory pricing and price discrimination claims. 509 U.S. at 223 n. 1, 113 S.Ct. at 2588 n. 1. However, noting its decisions in *Cargill Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) and *Matsushita,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court stated that the reasoning in both of those opinions "suggests that only below-cost prices should suffice, and we have rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." *Brooke Group,* 509 U.S. at 223, 113 S.Ct. at 2588. The Court found that the

---

**10.** In *Rebel I,* the court addressed only antitrust injury under the Robinson–Patman Act. The court found that Rebel must prove that ARCO had a degree of market power to threaten oligopolization, not monopolization, which is the requirement under the Sherman Act. 51 F.3d at 1447.

exclusionary effect of prices above a relevant measure of cost reflect either the lower cost structure of the alleged predator and competition on the merits, or is "beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting." *Id.* at 223, 106 S.Ct. at 2588 (citing 3 P. Areeda & H. Hovenkamp, Antitrust Law ¶¶ 714.2, 714.3 (Supp.1992)).

 Under Ninth Circuit authority, a failure to show price is below average variable or marginal cost [11] is usually fatal to a predatory pricing claim. *Universal Analytics v. MacNeal–Schwendler Corp.*, 707 F.Supp. 1170, 1178 (C.D.Cal.1989).[12] Cost based methods involve determining numerous costs of the seller who is accused of predatory pricing. *Taggart v. Rutledge*, 657 F.Supp. 1420, 1437 (D.Mont.1987). The Ninth Circuit articulated the relevant cost measurements for predatory and discriminatory pricing in *Transamerica Computer Co. v. IBM*, 698 F.2d 1377 (9th Cir.1983), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983). The court noted that whether prices are predatory depends "not on their effectiveness in minimizing losses, but on their tendency to eliminate rivals and create a market structure enabling the seller to recoup his losses." *Id.* at 1386. The court found that *Inglis I* set forth a cost-based test for allocating the burden of proof in preda-tion cases. The court articulated the test as follows:

> If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors.

*Id.*[13] In *Transamerica*, the court held that prices above average total cost are not legal per se, and found that *Inglis* left open the question of how to evaluate prices that exceed average total costs ("ATC"). *Id.*[14]

The court went on to find that if the challenged prices exceed average total cost, the plaintiff must prove by clear and convincing evidence that the defendant's pricing policy was predatory. *Id.*[15] The court held that Transamerica had not met this standard. The only price increases were modest increases during the mid–1970's, which was a general inflationary period, thus the court found no evidence that IBM's prices rose once competition had left the market. Transamerica also failed to prove limit pricing, as there was merely evidence of an initial price cut, "hardly an unusual act in the

11. Marginal cost is the cost a firm incurs in the production of one additional unit of output. *Rebel I*, 51 F.3d at 1431. Average variable cost measures costs which vary with output, and is a generally accepted substitute for marginal cost in antitrust cases. Average total cost ("ATC") is an average of variable costs and fixed costs.

12. In *Universal Analytics*, the court found that the plaintiff's predatory pricing claims failed as a matter of law because there was no indication that the defendant set prices below its marginal or average variable cost. *Id.* at 1179.

13. All of the presumptions are rebuttable by a showing of predatory or nonpredatory purpose. *In re Air Passenger Comp. Res. Sys. Antitrust Litigation*, 694 F.Supp. 1443, 1464 (C.D.Cal. 1988).

14. In *Transamerica*, the court noted situations in which prices above ATC would be illegal. First,

a monopolist cannot set prices above ATC but below the short-term profit-maximizing level so as to discourage new entrants and maximize profits over the long run ("limit pricing"). 698 F.2d at 1387. While it may be difficult in many instances to assess the long-run consequences of these policies, where these difficulties can be overcome, plaintiffs should be allowed to prove these violations exist. *Id.* The court was hesitant to create a "free zone" in which monopolists can exploit their power without fear of legal scrutiny. "A rule based exclusively on cost forecloses consideration of other important factors, such as intent, market power, market structure, and long-run behavior in evaluating the predatory impact of a pricing decision." *Id.*

15. The Supreme court in *Cargill*, 479 U.S. at 117 n. 12, 107 S.Ct. at 493 n. 12, declined to determine whether above-cost pricing coupled with predatory intent is ever sufficient to state a claim of predation.

computer industry or unusual in the fact of competition." *Id.* at 1389.

In *Taggart,* the court found that the plaintiffs did not even mention the defendant's costs, but only alleged that on several occasions the defendant's wholesale prices exceeded retail prices. 657 F.Supp. at 1437. The court noted that on at least one occasion, the Ninth Circuit has departed from its strict rule of comparing retail price and average variable cost, and remanded the case to allow the plaintiff to show by means other than a cost-price comparison that the defendant's price was predatory. *Id.* (citing *Marsann Co. v. Brammall, Inc.,* 788 F.2d 611, 615 (9th Cir.1986)). The *Taggart* court noted that the ruling in *Marsann* hinged on the difficulty of fixing the identity of the product for which to establish average variable costs. *Id.* The court went on to find that in a situation involving retail and wholesale gasoline competitors, that the threshold showing for predatory pricing had not been met. *Id.*

The Supreme Court has noted that predatory pricing schemes are rarely tried, and even more rarely successful, since the predator must make a substantial investment with no assurance that it will pay off. *Matsushita,* 475 U.S. at 589, 106 S.Ct. at 1357. Furthermore, a significant purpose of antitrust laws is to foster competition, and cutting prices to increase market share is the very essence of competition. Mistaken inferences in predatory pricing cases are therefore especially costly, since they chill the very conduct the laws are intended to protect. *Id.* at 594, 106 S.Ct. at 1359–60. Competitors are not protected from a loss in profits due to a decision by another firm to cut prices in order to increase market share. *Cargill,* 479 U.S. at 116, 107 S.Ct. at 492. This would be a perverse result indeed, as it is in the interest of competition to permit dominant firms to engage in price competition. *Id.* Accordingly, an objective cost analysis is the crucial component in a prima facie case of predatory pricing. *International Travel Arrangers v. NWA, Inc.,* 991 F.2d 1389, 1394 (8th Cir.1993). This requirement may "make it extremely difficult for plaintiffs to prove predatory pricing in antitrust cases[, but t]hat difficulty, however, reflects the economic reality 'that predatory pricing schemes are rarely tried, and even more rarely successful.'" *International Travel,* 991 F.2d at 1396, (quoting *Matsushita,* 475 U.S. at 589, 106 S.Ct. at 1357).

While the Ninth Circuit held that cost-based inquiries serve merely as an aid in determining if predatory pricing occurred in *Inglis I,* this decision must be viewed in light of *Brooke Group,* which was decided after the *Transamerica* and *Inglis I* cases. The Ninth Circuit has stated that when an alleged predator's prices are above ATC, predatory intent may be proved by clear and convincing evidence. However, *Brooke Group* makes it clear that prices above a relevant measure of cost will not suffice to infer the predatory motive necessary to support a price discrimination claim. Therefore, Rebel must either prove that ARCO's prices were below a relevant measure of ARCO's costs, (which will also allocate the burden of proof under *Transamerica*) or show by clear and convincing evidence other than price-cost comparisons that ARCO possessed predatory intent.

### 1. The Tosco Agreement

Preliminarily, this Court notes that its inquiry is limited to whether Rebel's measures of ARCO's cost are *legally* adequate, not whether the specific amount of costs is accurate. The precise amount of ARCO's costs is a factual determination properly decided at trial. Additionally, the weight or credibility of Rebel's economic and other experts are not proper subjects for review at this stage of the proceedings. *See D & S Redi–Mix v. Sierra Redi–Mix & Contracting Co.,* 692 F.2d 1245, 1248 (9th Cir.1982). It is true that cost based inquiries are difficult, since economics is an inexact science, and that such inexactitude is not synonymous with legal insufficiency of the evidence. *Id.* Given Rebel's measurements of ARCO's costs, the Court must determine whether a jury could reasonably return a verdict for Rebel in light of the standards governing a price discrimination claim.

The first measure of ARCO's costs on which Rebel relies is the Tosco exchange agreement. Under the agreement, ARCO

exchanged 50,000 barrels per day of crude oil for 30,000 to 35,000 barrels per day of gasoline refined by the Tosco Corporation.[16] Rebel alleges that the market value of each barrel of oil exchanged is the marginal cost to ARCO of producing a barrel of gasoline. Rebel basis its analysis on the fact that ARCO had more crude oil than refining capability, so the Tosco agreement measured the cost of producing an additional barrel of gas.

■ Rebel cites ARCO's appellate Motion to Reconsider the *Rebel I* decision for the proposition that ARCO has conceded that a question of fact exists as to whether below cost pricing occurred. In its Motion to Reconsider, ARCO argued that whether prices are below cost was a contested issue of fact. Rebel alleges that ARCO should be bound by this statement. This Court is not bound by ARCO's arguments in its Motion to Reconsider before the Ninth Circuit. Furthermore, the Motion was submitted to the Court of Appeals at a stage in the proceedings when the only substantive discovery that had taken place involved ARCO's market share and market power. No substantial discovery concerning ARCO's costs had been undertaken at the time ARCO's Motion was submitted. ARCO also contends that it was merely attempting to prevent Rebel from arguing that the Ninth Circuit adopted the Tosco agreement as the only cost measure. For these reasons, this Court finds that ARCO's arguments in its prior Motion to Reconsider are not binding in the current proceedings.

■ Rebel next relies on the law of the case doctrine and the Ninth Circuit's decision in *Rebel I* to support its use of the Tosco agreement. Rebel cites footnote 1 of *Rebel I* for the proposition that the Ninth Circuit adopted the Tosco agreement as the measurement of marginal cost to be utilized in this case. This argument is incorrect. The Ninth Circuit was merely setting forth Rebel's factual allegations. This is clear from the context of the footnote, "Rebel measured ARCO's marginal cost based upon an agreement that ARCO signed with Tosco Corp.... Rebel claims ... The cost of this "last barrel" of gasoline represents ARCO's marginal cost for gasoline." *Rebel I,* 51 F.3d at 1431. As the issue of below cost pricing was not before the court in *Rebel I,* any dicta addressing cost measurements is not law of the case or binding upon this Court.[17] This Court cannot logically conclude that the Ninth Circuit would adopt Rebel's cost measurement as adequate when little or no discovery had been conducted on costs. Therefore, this Court must independently analyze whether the Tosco agreement is a relevant measure of cost under the *Brooke Group* analysis.

■ Rebel bases its use of the Tosco agreement primarily on the testimony of Dr. Keith Leffler ("Leffler"). Leffler stated that he believed that refinery computer simulation models which measure marginal cost in the traditional economic methodology were available to all refiners and that this was an approach that ARCO would probably use. (Leffler's Statement in Response to ARCO's Mtn. for Summary Judgment). However, Leffler did not utilize this method, since he did not have the proper knowledge, or "have access to people at ARCO." (Leffler Depo. at 136). Rebel has made no showing that it ever attempted to obtain such information,

**16.** Courts have held that similar "swaps" are trades, not sales, and therefore not subject to attack under the Robinson–Patman Act. *See Airweld, Inc., v. Airco, Inc.,* 576 F.Supp. 676, 679 (D.Or.1983).

**17.** Rebel cites Areeda and Hovenkamp, *Antitrust Law,* Vol. III (Revised Edition 1996). On pages 378–79, the authors discuss *Rebel I,* and state that if ARCO was unable to supply its own refineries, and purchased more gasoline from independent suppliers, this would measure marginal cost. If ARCO paid more than it charged upon resale, its price would be below marginal cost. However, the central concern regarding the

Tosco agreement is that Rebel has not alleged ARCO purchased gas or incurred any *direct* cost in obtaining the gasoline. As Rebel's expert Dr. Leffler ("Leffler") admits, ARCO did not purchase additional barrels of gasoline, so there was no "cost" to ARCO in terms of a purchase price. Rebel evaluates ARCO's cost solely by the market price of oil. Leffler states that the marginal cost to ARCO is the market price of oil, whether ARCO purchased, exchanged, or was given the oil. Thus, Areeda and Hovenkamp's analysis, which may apply if ARCO purchased the gasoline, is inapplicable when Rebel values the exchange solely on the prevailing market price of oil.

and ARCO asserts that Rebel made no such discovery requests.

While Leffler stated that joint aspects of gas production make evaluation of average variable costs "problematic at best," he also stated that the variable cost of producing crude oil is "small for anybody" and can be close to zero. (Leffler Depo. Vol III at 427). Although this would indicate that the average variable cost of producing crude oil is substantially below the market price of oil, Leffler adopted the Tosco agreement as a "direct measure" of marginal cost. Since there is no price paid by ARCO under the Tosco agreement, Leffler measured this "marginal cost" of gas to ARCO as the prevailing market price of the crude oil exchanged under the agreement, regardless of whether ARCO bought the oil, exchanged the oil, or was given the oil for free. (Leffler Depo. Vol III at 427).

 The Tosco agreement merely measures the opportunity cost to ARCO of trading its crude oil for gasoline. Opportunity costs are the benefits a firm foregoes by choosing one course of action over another. The Tosco agreement measures opportunity costs because it evaluates ARCO's "cost" of gasoline by the value of what it gave up by not selling the barrel of oil at market price. The opportunity costs of a decision are not one of the costs of implementing a particular business decision. *Continental Airlines,* 824 F.Supp. at 701. It is improper as a matter of law to use opportunity costs to show below cost pricing. *In re IBM Peripheral EDP Devices, Etc.,* 459 F.Supp. 626, 631 (N.D.Cal. 1978). Opportunity costs are not reflected in a profit and loss statement, and allowing opportunity costs as a method of cost measure in predatory pricing cases would impermissibly restrict the decision making power of businesses. *See Id.* This was not the intent of the antitrust laws, and is not what is meant by predatory pricing. *Id.* Leffler noted that courts have rejected the use of opportunity costs in evaluating cost measure-

ments, and Rebel has failed to supply any authority that utilizes opportunity cost as a valid measure of marginal cost in a predatory pricing or price discrimination case.

Rebel's use of the Tosco agreement is entirely based on the market price of the oil, but *Brooke Group* explicitly rejected measurements of cost which are below general market levels or the costs of a firm's competitors. 509 U.S. at 223, 113 S.Ct. at 2587–88. Rebel's measurement of the marginal cost of gasoline to ARCO is improper, as it is entirely dependent on fluctuations in market price. Accepting Rebel's analysis, ARCO's price would be above or below marginal costs dependent entirely on fluctuations in the market price of crude oil, not dependent on any costs that ARCO actually incurred. This does not adequately approximate the costs to ARCO of producing gasoline. To accept Rebel's analysis, anytime ARCO priced gasoline below the *market price* of oil, they would violate the antitrust laws. Rebel has made no attempt to measure ARCO's actual costs of producing and transporting oil to the Tosco refinery. The Tosco agreement fails to provide such a measurement, and therefore cannot be used as a proxy for marginal cost.

### 2. Los Angeles/Las Vegas Price Comparisons

 Rebel also alleges ARCO's prices were below cost because its wholesale prices in Las Vegas from 1986–89 were below the wholesale rack price in Los Angeles.[18] Rebel argues that since Los Angeles is a very competitive market, and the rack price is that charged by the most efficient seller, prices in Los Angeles are an adequate proxy for marginal cost.[19] Rebel's comparison of market price in two separate markets is merely a showing of the definition of price discrimination. Rebel has shown that ARCO charged different prices to different buyers in different markets. To accept this as a measure of cost would be to read the rele-

---

**18.** Rebel alleges that ARCO's price in Los Angeles was below its Las Vegas price during the period of recoupment. This has no bearing on whether ARCO charged below cost prices during the *predatory* period. These are two different requirements under an antitrust claim.

**19.** According to economic theory, in a perfectly competitive market, a firm's price is equal to its marginal cost.

vant measure of cost requirement out of Robinson–Patman Act claims. Furthermore, the Los Angeles rack price is a market price, clearly impermissible as a cost measurement under the analysis of *Brooke Group.*

Rebel cannot avoid the requirements of *Brooke Group* by alleging that one of the prices ARCO charged in discriminating against Rebel was a very efficient price, and therefore approximated marginal cost. Rebel has made no showing of ARCO's actual costs of producing gasoline. The only costs Rebel even attempted to show are the transportation costs of pumping the gasoline across the Cal–Nev pipeline and terminaling costs. However, as Rebel merely adds this cost to the prices in Los Angeles, this is insufficient to approximate the real cost to ARCO of producing gasoline for sale in Las Vegas.

### 3. Prices Charged to Prestige Stations by ARCO

■■ Rebel alleges that the price ARCO charged to its wholly owned subsidiary Prestige Stations Inc. ("PSI") meant that PSI incurred large losses. This theory is supported by the testimony of Rebel expert Harry Holcombe ("Holcombe").[20] Holcombe concludes that PSI is controlled and dominated by ARCO, with no independence of its own. (Holcombe Rep. p. 19). Holcombe analyzed profit and loss statements from 1985 to 1989 based on the dealer tankwagon ("DTW") price charged by ARCO, alleging this was the market price, and the price that ARCO charged its lessee dealers. *Id.* at 25. Since PSI lost substantial amounts of money during this period, ARCO was "willing to lose money" as a result of predatory pricing. *Id.* Holcombe supports this tautology by stating that "it is unlikely that ARCO would set a transfer price which is unrealistic." *Id.* at 26.

■■■ If ARCO and PSI are truly a combined unit, as Holcombe states, then the appropriate consideration is "the costs of the combined group to determine if the combined group sold below its costs." *Vollrath Co. v. Sammi Corp.,* 9 F.3d 1455, 1460 (9th Cir.

1993). To show below costs sales by a parent corporation and a subsidiary, the costs of both parent and subsidiary must be proved. *Id.* at 1461. In *Vollrath,* the Ninth Circuit upheld the district court's grant of JNOV due to a lack of evidence of the parent company's costs. *Id.* Similarly, Rebel has failed to show the costs of ARCO and PSI, rather has merely alleged that PSI lost money. This is insufficient to support a predatory pricing claim, and therefore this measure of cost is impermissible.

■■ Holcombe also calculated ARCO's cost by merely comparing ARCO's profits in its Las Vegas operations with its nationwide gasoline sales. He then concluded that if ARCO had operated at these profit levels nationwide, it would have seen a large decrease in *income* over the relevant time period. (Holcombe Rep. p. 26). This is clearly insufficient to prove below cost pricing, and may be evidence of precisely the price competition that the antitrust laws are designed to encourage. In *Phototron Corp. v. Eastman Kodak Co.,* 842 F.2d 95, 99 (5th Cir.1988), the court found that operating at a substantially reduced profit margin was not pricing in a predatory matter, rather it was simply pricing in a competitive manner. In order to meet the requirements of predatory pricing, the plaintiff must present some evidence that the defendant priced below *its* costs. *Id.* at 100. Holcombe also alleged that Rebel suffered losses in trying to match ARCO's prices, so "it stands to reason" that ARCO would suffer the same losses. (Holcombe Rep.P. 26). On the contrary, this does not "stand to reason," and may indicate the lower cost structure of ARCO, as articulated by the Supreme Court in *Brooke Group.*

### 4. Clear and Convincing Evidence of Predatory Intent

■■ Under Ninth Circuit authority, a plaintiff in a price discrimination case can also state a claim by showing clear and convincing evidence of predatory intent. In

---

**20.** Holcombe is qualified to testify as an expert in the petroleum industry, but is not qualified to testify as an economic expert. However, for

purposes of addressing the PSI method of determining ARCO's costs, this Court will assume Holcombe's testimony is admissible.

*Drinkwine v. Federated Publications, Inc.,* 780 F.2d 735 (9th Cir.1985), the court held that since the plaintiffs had failed to introduce any evidence on defendant's marginal, average variable or average total costs, they must prove by clear and convincing evidence that their pricing policy unreasonably restricted competition. *Id.* at 739. This Court is mindful of *Brooke Group*'s admonition that measurements other than cost are extraordinarily difficult for a court to undertake without chilling competition. Rebel has failed to provide any evidence that would meet this standard. Rebel has failed to provide evidence of limit pricing by ARCO in terms of lowering prices in response to specific firms attempting to enter the Las Vegas market. ARCO has also alleged strategic reasons for its generally lower prices, that of initial entry into the new market of cash only self serve sales. *See Transamerica,* 698 F.2d at 1389.

Rebel has alleged that ARCO increased its prices from 1990 to 91, but as in *Transamerica,* this was during an inflationary period, the Gulf War, at a time when the price of all petroleum prices increased. Rebel has also alleged that from 1990–91 ARCO's Las Vegas prices exceeded its prices in Los Angeles. This price differential may be evidence of actual or potential recoupment, but it does not infer that prices in 1986–89 were below cost and therefore predatory. To accept later price increases as evidence of predatory intent would collapse predatory pricing cases into only a showing of recoupment. Rebel has offered no evidence that provides inferences of ARCO's predatory intent without impermissible speculation, and has failed to provide clear and convincing evidence of such intent.

It may be that in cases where multiple products are produced at once such as gasoline and petroleum products, and where there is no "smoking gun" of predatory intent, plaintiffs will incur difficulties in proving antitrust violations. However, these difficulties must be balanced against the real dangers to competition from inferring predatory intent from circumstantial evidence and above cost pricing. Congress and the Supreme Court have struck that balance by requiring below cost pricing in order to sustain a price discrimination claim. The risks of chilling legitimate competition are simply too great to infer predatory intent from the showing Rebel has made of ARCO's alleged anticompetitive conduct. As Rebel's showing does not meet the legal standards under the antitrust laws, ARCO is entitled to summary judgment as a matter of law.

IT IS THEREFORE ORDERED THAT Defendant's Motion for Summary Judgment (# 617) is GRANTED and the Clerk of Court is hereby directed to enter Judgment in favor of Defendant ARCO and against Plaintiff Rebel.

IT IS FURTHER ORDERED THAT the Pretrial Conference, currently scheduled for March 14, 1997, and the trial date previously scheduled for March 24, 1997, are hereby vacated.