**YANKEES ENTERTAINMENT AND SPORTS NETWORK, LLC, Plaintiff,**

v.

**CABLEVISION SYSTEMS CORPORATION and CSC Holdings, Inc., Defendants.**

**No. 02 CIV. 3242(DAB).**

United States District Court, S.D. New York.

Sept. 4, 2002.

---

Alan B. Vickery, Philippe Z. Selendy, Marianne Fogarty, Edward Normand, Helen M. Maher, Boies, Schiller & Flexner, LLP, New York City, for plaintiff.

Yvonne S. Quinn, Michael T. Tomaino, Jr., Antony M. Candido, Vincent P. Sherman, Elizabeth M. Zito, Sulllivan & Cromwell, New York City, for defendants.

## OPINION

BATTS, District Judge.

Plaintiff Yankees Entertainment and Sports Network, LLC (hereinafter "YES") brings this antitrust action pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 7 of the Clayton Act, 15 U.S.C. § 18, Section 4 of the Clayton Act, 15 U.S.C. § 15, as well as Section 340 of the Donnelly Act, N.Y.Gen.Bus.L. § 340, for alleged monopolization of the greater New York area sports programming, broadcast rights, advertising, and distribution of multi-channel video programming markets. Defendants Cablevision Systems Corporation and CSC Holdings, Inc. (hereinafter together "Cablevision" or "Defendant") now move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ten claims wholly or partially comprised in the Complaint's Counts I, II, III, IV, V, VI, and VII for failure to state a claim upon which relief can be granted.[1]

For the reasons set forth below, Defendant Cablevision's motion to dismiss is denied in part and granted in part.

## I. BACKGROUND[2]

### A. The Parties

Defendant Cablevision and its wholly owned subsidiary CSC Holdings, Inc., are Delaware corporations which directly or indirectly own and operate cable television programs in various areas of New York, New Jersey, and Connecticut. (Compl.¶¶ 25, 26, 38.) As a cable operator which provides pay television programming within its service area, Cablevision is considered to be a multichannel video programming distributor ("MVPD").[3] (Compl.¶ 40.) Unlike other types of MVPDs, cable operators like Cablevision serve only those areas for which they are granted franchises by local government authorities for fixed periods of time. (Compl.¶ 36.)

Plaintiff YES, a Delaware limited liability company, is a regional sports programming network launched on September 10, 2001 which has purchased the local broadcast rights to, among others, New York Yankees baseball games beginning with the 2002 baseball season. (Compl.¶¶ 2, 4, 24.) It has since reached agreement with more than 30 television operators and satellite direct broadcast systems (with the notable exception of Cablevision) for the distribution of its programming in the greater New York metropolitan area to approximately 5.3 million subscribers. (Compl.¶ 4.)

According to YES, Cablevision's cable television systems are "clustered" in the New York metropolitan area (covering roughly more than 3 million households) and likely comprise the largest cluster of cable systems in the United States.

---

1. While the Parties appear to be in some disagreement as to the correspondence of Cablevision's ten "claims" to the "counts" enumerated in the Complaint (Def.'s Mem.Law at 12–14; Pl.'s Mem.Law at 3–4), for the purposes of clarity and simplicity, this Court will refer to the Counts alleged rather than the Claims enumerated by Defendant.

2. Since the instant motion is a Rule 12(b)(6), the facts recited herein are drawn from the Plaintiff's Complaint.

3. Other examples of MVPDs include direct broadcast satellite operators, multi-point multi-direction system operators and others who use different delivery methods for the provision of pay television programming. (Compl.¶ 40.)

(Compl.¶ 38.) Specifically, Cablevision provides its customers with a subscription television service which includes television broadcast networks, news, entertainment, general programming, and national and regional sports programming. (Compl.¶¶ 36, 42.) Cablevision, subject to some regulation by local franchising authorities, decides which networks to distribute to their subscribers by paying a programming network, like YES, for the right to include a particular network in its programming options. (Compl.¶¶ 43, 70–71, 85.)

Moreover, Cablevision, like many MVPDs, determines the package of channels available to subscribers through a tiered system, whereby a subscriber can purchase the simplest "Broadcast Basic", an expanded "Family Cable", and then three tiers of "Optimum TV". (Compl.¶ 43.) Each successive tier is more expensive and includes additional channels. (Compl.¶ 43.) Cablevision may also sell subscriptions to "premium" programming, such as HBO, not as part of a package, but separately on a channel-by-channel basis. (Compl.¶¶ 42, 85.)

In addition to its distribution of programming, Cablevision also indirectly owns a partial interest in Madison Square Garden LP ("MSG LP"), which in turn owns, *inter alia*, MSG Network ("MSG") and Fox SportsNet New York ("FSNY"). (Compl.¶ 48.) MSG[4], FSNY, and now YES are the only existing regional sports networks, that is, networks focused primarily on airing live sporting events of local sports teams, in the greater New York metropolitan area. (Compl.¶¶ 7, 29, 35, 48.) Cablevision sells MSG and FSNY to other MVPDs that want to make regional sports programming available to their

subscribers as part of an expanded basic package. (Compl.¶ 83.)

## B. The Markets

YES has identified and defined four relevant markets for the purpose of the instant case: (1) local sports broadcast rights, (2) regional sports programming, (3) distribution of multi-channel video programming, and (4) advertising on regional sports networks. (Pl.'s Mem.Law at 3.) The first, the purchase and sale of local broadcast rights to local professional sports teams, concerns the sale by the owners/creators of sporting events of their rights to televise to owners of Programming Networks such as MSG and YES. (Compl.¶¶ 30, 31.)

The second, the purchase and sale of programming of local professional sporting events, occurs between the aforementioned Programming Networks and various MVPDs, such as cable operators, for delivery to their subscribers. (Compl.¶¶ 27–29.)

The third, the market of the distribution of multi-channel programming, involves the purchase and sale of pay television services between competing MVPDs and the residents and businesses in their respective service area. (Compl.¶¶ 32, 33.)

Finally, the advertising on regional sports networks market refers to the buying and selling of advertising time on regional sports programming services between advertisers and either the Programming Network or the MVPD. (Compl.¶¶ 34, 35.)

## C. The Dispute Between YES and Cablevision

Since its creation in September 2001, YES has actively sought to have its net-

---

**4.** Prior to the creation of YES, MSG owned the local broadcast rights to the New York Yankees until early October 2001, when the Yankees exercised its option to terminate its contract with MSG. (Compl.¶ 55.)

work distributed to the largest possible audience, and YES reached agreement with more than thirty subscription television distribution systems for its broadcast as part of expanded basic cable service, the "most popular tier of subscription television services." (Compl.¶¶ 4, 62.) Cablevision is the only large cable operator in the greater New York metropolitan area with which YES has not reached an agreement, making New York Yankees games unavailable to Cablevision's 3 million subscribers. (Compl.¶ 63.)

Despite a series of negotiations dating from October 2001, YES and Cablevision have been unable to reach agreement on two major issues: the tier of service on which YES would be offered to Cablevision subscribers and the price to be paid by Cablevision to YES.[5] (Compl.¶¶ 65–73.) Specifically, YES states that Cablevision, in alleged violation of Federal Communications Commission ("FCC") regulations, stated that "it would carry YES Network only if there were cable exclusivity, and YES Network would be unavailable to satellite distributors." (Compl.¶ 66.) Further, YES alleges Cablevision offered to carry YES as a "premium" channel, instead of carrying it on an expanded basis tier—"an offer deliberately constructed to ensure that the YES Network would have minimal market penetration because regional sports networks generally cannot be successfully marketed on premium channels." (Compl.¶ 67.) YES further characterizes Cablevision's offer of providing YES with its own wholly controlled subscription channel as unprecedented and untenable, since YES is not set up to administer billing or collections. (Compl.¶ 70.) Finally, YES claims that

the per-subscriber rate proposed by Cablevision is "significantly below the economic value of the YES Network by any standard industry measure" and is designed to "drive YES Network out of business." (Compl.¶ 90.)

In sum, YES alleges that Cablevision "is using its status as a vertically integrated multichannel video programming distributor[6] to protect its monopoly over local sports programming by refusing to grant YES Network carriage on its system on nondiscriminatory terms such as those terms and conditions available to its affiliates." (Compl.¶ 99.) YES claims injury stemming from "having fewer viewers, less advertising at reduced fees, and the loss of revenue from subscriber fees." (Compl.¶ 121.)

As such, on April 29, 2002, YES set forth eight Counts alleging: (1) attempted monopoly of regional sports programming market in violation of the Sherman Act; (2) attempted monopoly of local broadcast rights market in violation of the Sherman Act; (3) depriving Plaintiff access to an essential facility in violation of the Sherman Act; (4) refusal to deal to maintain monopoly of regional sports programming in violation of the Sherman Act; (5) illegal monopoly leveraging in violation of the Sherman Act; (6) anticompetitive horizontal integration in violation of the Clayton Act; (7) anticompetitive vertical integration in violation of the Clayton Act; and (8) anticompetitive arrangement and combination in violation of the Donnelly Act. (Compl.¶¶ 116–169.)

Cablevision now moves to dismiss on the following grounds:

---

5. Cablevision disputes YES' following rendition of facts regarding the negotiations, which as stated here will be taken as true for the purposes of this motion to dismiss.

6. "Vertical integration" refers to Cablevision's ownership of both a distribution facility and programming networks. (Compl.¶ 157.)

1. YES does not have antitrust standing to pursue a claim of attempted monopolization of the alleged "local broadcast rights" market because no causation exists for YES' alleged injury and alternatively, the injury is not cognizable as an "antitrust injury".

2. YES does not have antitrust standing to pursue a claim for attempted monopolization of the alleged market for "sale of advertising time" solely on regional sports networks because no causation exists for YES' alleged injury and alternatively, the injury is not cognizable as an "antitrust injury".

3. YES has failed to plead, as required, that Cablevision has market power in Internet services in order to sustain its alleged tie-in claim and YES has no standing to attack Cablevision's approach to offering Internet and video programming services.

4. YES does not have antitrust standing to challenge the 1997 acquisition of Madison Square Garden.

5. YES cannot state a claim under the "essential facility" doctrine because (i) YES has access pursuant to the leased access provision of the Cable Act, 47 U.S.C. § 532(4)(A)(i); (ii) YES is trying to sell Cablevision a service, not gain access to a facility; and (iii) YES is seeking *better* access, not the same access. (emph. incl. in original)

6. YES' allegations regarding maintenance or expansion of a monopoly cannot state a claim under the Donnelly Act that requires, instead, a combination or conspiracy.

7. YES has no right to enforce in this Court the FCC regulations regarding programming carriage, 47 C.F.R. § 76.1301, that it alleges Cablevision has violated.

## II. DISCUSSION

It is well-settled that in evaluating a motion to dismiss, the Court must accept Plaintiff's allegations as true and must draw all inferences in Plaintiff's favor. *See Diezcabeza v. Lynch,* 75 F.Supp.2d 250, 255 (S.D.N.Y.1999); *Mackey v. Property Clerk of New York City Police Dept.,* 26 F.Supp.2d 585, 588 (S.D.N.Y.1998). The Court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir. 2000) (*quoting Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (internal quotation marks omitted)). Accordingly, dismissal of a complaint for failure to state a claim is warranted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also ICOM Holding, Inc. v. MCI Worldcom, Inc.,* 238 F.3d 219, 221 (2d Cir.2001).

■ Nevertheless, it is axiomatic that "conclusory allegations which merely recite the litany of antitrust" will not suffice. *John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. 156, 163 (S.D.N.Y.1991); *see also Re–Alco Indus., Inc. v. National Ctr. for Health Educ., Inc.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993) ("[an antitrust complaint] must adequately ... define the relevant product market, ... allege antitrust injury, [and] ... allege conduct in violation of antitrust laws.").

### A. Federal Antitrust Law

■ As delineated by the Supreme Court, the Sherman Act was enacted to

assure customers the benefits of price competition and with the "central interest" of "protecting the economic freedom of participants in the relevant market." *Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 538, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Specifically, Section 2 of the Sherman Act provides, in part, that "Every person who shall monopolize ... any part of the trade or commerce among the several States ... shall be deemed guilty of a felony." 15 U.S.C. § 2 (1976). Section 2 is not primarily aimed at improper conduct which directly implicates the restraint of trade (as under § 1), but rather at the creation of a pernicious market structure by specific intent in which the "concentration of power saps the salubrious influence of competition." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 272 (2d Cir.1979).

The act of monopolization prohibited by 15 U.S.C. § 2 consists of two elements: "the possession of monopoly power in the relevant market[7] and ... the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Attempted monopolization has three elements: "(1) that the defendant has engaged in predatory or anti-competi-tive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.,* 822 F.Supp. 145, 153 (S.D.N.Y.1993) (*quoting United States v. Grinnell Corp.,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), and *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993))[8] As such, the Sherman Act is interpreted to condemn monopoly power only when it is accompanied by the "purpose or intent to exercise that power" in order to impede or destroy competition. *Berkey,* 603 F.2d at 274 (quoting *Griffith,* 334 U.S. at 107, 68 S.Ct. at 945); *see also United States v. Aluminum Co.,* 148 F.2d 416, 430 (2d Cir.1945) ("The successful competitor, having been urged to compete, must not be turned upon when he wins."); 3 Phillip Areeda, Hovenkamp, & Blair, *Antitrust Law* ¶ 637 (2d ed.2002).

The Clayton Act, 15 U.S.C. §§ 12–27 (1976), was passed to strengthen and clarify the Sherman Act and, *inter alia,* § 7 encompasses conduct where the effect of mergers "may be substantially to lessen competition or tend to create a monopoly in any line of commerce." Despite the utilization of different verbiage in the two Acts, standards of liability under the Clayton Act largely mirror those under the Sherman Act. *See* 2 Areeda & Hovencamp, *supra,* § 301 at 7 ("[N]o difference in the

---

7. The definition of the relevant market involves the specification of its dimensions, specifically, its product, geographic and time dimensions. 2 Earl W. Kintner, *Federal Antitrust Law* § 12.2 (1980). The Second Circuit has elucidated that the relevant market definition "must encompass the realities of competition." *Balaklaw v. Lovell,* 14 F.3d 793, 797 n. 9 (2d Cir.1994) (*quoting Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 709 (4th Cir.1991)) (defining relevant employment market as geographically broader than Plaintiff's exclusively local definition).

8. The attempt to monopolize offense is closely tied to completed monopolization. *See American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (approving jury instruction defining attempt to monopolize as "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it").

criteria for illegality or the mode of analysis follows from the difference between the 'unreasonable' formula of the Sherman Act and the 'substantial lessening of competition' formula of the Clayton Act.").

## B. Antitrust Standing

◼ The Supreme Court has identified several factors to consider in determining whether a particular plaintiff has "antitrust standing", including *inter alia:* (1) the causal connection between the alleged antitrust violation and the alleged harm suffered by the plaintiff; (2) whether the injury was of a type that Congress sought to redress with the antitrust laws; (3) the directness or indirectness of the connection between the asserted injury and the alleged restraint in the relevant market; (4) the existence of an identifiable class of persons other than plaintiff who were more direct victims of the antitrust violation; (5) the potential for duplicative recovery or complex apportionment of damages; and (6) the speculative nature of the damages. *See Associated General Contractors,* 459 U.S. at 537–44 (1983).

◼ The Second Circuit has provided a "two-prong analysis" for determining antitrust standing. Under this test, "courts must [first] determine whether the plaintiff suffered an antitrust injury." *Balaklaw v. Lovell,* 14 F.3d 793, 797 n. 9 (2d Cir. 1994). If such injury is found, the next step is to "determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws." *Id.*

### 1. *Antitrust Injury: Local Broadcast Rights and Advertising Markets*

◼ Specifically, an antitrust injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Balaklaw,* 14 F.3d at 797 n. 9 (*quoting Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)) (finding no antitrust injury where plaintiff's claimed injury was "a result of his losing out in the competition for an exclusive [employment] contract [with Defendant], and nothing more."). In assessing injury, the Supreme Court has delineated:

> Conduct in violation of the antitrust law may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

*Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 343–44, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

The antitrust injury requirement underscores the fundamental tenet that "[t]he antitrust laws ... were enacted for 'the protection of competition, not competitors.' " *Brunswick,* 429 U.S. at 488, 97 S.Ct. 690 (*quoting Brown Shoe v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)) (finding no antitrust injury where the defendant had preserved competition by acquiring a number of plaintiff's bowling alley competitors that would have otherwise gone out of business); *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 543 (2d Cir.1993) ("[T]he challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been

harmed as an individual competitor will not suffice. Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors."); *see also* 2 Areeda & Hovenkamp, *supra,* ¶ 337 at 312 ("The antitrust injury concept thus requires the antitrust plaintiff to show that its own injury coincides with the public detriment tending to result from the alleged violation."). The requirement that the plaintiff's injury results from a threat to competition is invaluable in distinguishing the efficient, vertically integrated defendant properly situated outside the ambit of antitrust laws from the economic monopoly which is the target of the antitrust laws. *See, e.g., Viacom v. Time Inc.,* 785 F.Supp. 371, 379 (S.D.N.Y.1992) ("It is of course axiomatic that the antitrust laws do not operate to prevent a vertically integrated firm from reaping the rewards of its efficiency or to punish a company that profits from its expertise and innovativeness.")

■■■ YES alleges that Cablevision has specifically intended to monopolize the market for sports broadcast rights in the greater New York metropolitan area and has "engaged in anticompetitive conduct" designed to "cause YES to fail." Compl. ¶ 118. The main basis for the conduct appears to consist of Cablevision's refusal to carry YES on its cable television systems: "Cablevision's anticompetitive conduct relevant to this claim includes at least its refusal to deal with YES on terms of carriage on its cable facility to preclude YES from competing with Cablevision and its MSG and FSNY networks in the broadcast rights market, and its attempt to use its monopoly in the regional sports programming market to monopolize the local broadcast rights market." Pl.'s Memo. Law at 11. YES alleges it is harmed by

"having fewer viewers, less advertising at reduced fees and the loss of revenues from subscriber fees." Compl. ¶ 121. In other places in the Complaint, YES further alleges harms including the limitation of its ability to purchase broadcast rights and, by reducing its reach to subscribers, the rendering of YES as a "less desirable vehicle" for the distribution of programming. Compl. ¶¶ 106–08, 124–5.

In the market for the sale of advertising, YES alleges it is harmed because (1) YES is made a less attractive seller in the advertising market; (2) YES is precluded from expanding its sales of advertising time; (3) YES's advertising sales revenues is lowered and (4) YES is sought to be eliminated as a competitor in the advertising market. *See* Compl. ¶¶ 12, 34–5, 103, 108, 120, 135–36, 148–49.

Cablevision claims that YES has no standing to challenge the purported antitrust action in these markets because (1) YES is not a team owner/advertiser so increased rates do not cause YES any harm; (2) YES is a buyer of television rights in the local broadcast rights market and a seller in the advertising market and as such, benefits from the alleged antitrust violation; and (3) YES is not the best suited Plaintiff, as the owners of sports broadcast rights and advertisers are an "identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *See* Def.Mem.Law at 18–19.

■■■ YES responds that it has standing in these markets because Cablevision seeks to eliminate YES as a competitor in the markets for the acquisition of local broadcast rights and for the sale of advertising and because YES is the "only competitor of Cablevision's affiliated MSG and FSNY sports networks, the intended direct result of Cablevision's conduct is the

suppression—and in fact elimination—of competition in the purchase of broadcast rights, enabling monopoly pricing." Pl.'s Mem.Law at 11–12 (quoting Compl. ¶¶ 8–10), 30–32 (quoting Compl. ¶¶ 12, 34–5, 103, 108, 120, 135–36, 148–49). Plaintiff also depends on the so-called "leverage" theory claim, an antitrust claim in which a violating defendant possesses monopoly power in one market and uses that power in support of an anticompetitive purpose in a second, competing market. *See* Pl.'s Mem.Law at 14–15.

■ Cablevision's arguments that YES did not suffer an antitrust injury because it is not a team owner and because it is a buyer in the market of broadcast rights are unavailing. The arguments appear to characterize the sole harm alleged by YES as a "reduction in the amount of money that team owners will be able to command for their television rights." Def.'s Mem. Law at 17. However, the harms alleged by the Complaint are broader in scope and do encompass, in addition to these alleged market distortions for sellers, harms to YES as an excluded competitor. The Complaint, read as a whole [9], does allege further that Cablevision intends to shut out YES and any other potential competitors [10] in order to ensure that "Cablevision is the only entity seeking to acquire regional broadcast rights of local professional sports teams." Compl. ¶ 124. The same can be said for YES' allegations in the advertising market; specifically that by

making YES less attractive to potential advertisers because of reduced subscriber access and fewer revenues, Cablevision is distorting and trying to eliminate competition in the market. Compl. ¶¶ 103, 108.

■ Cablevision's argument appears to conflate the Complaint's purported damages with allegations necessary to constitute antitrust injury. YES does not, and indeed, cannot, claim damages based upon team owners forced to demand lower rates or advertisers forced to pay higher rates to reach their targeted market, i.e., the 3 million Cablevision subscribers that constitute almost 40% of the greater New York metropolitan area market. *See* Compl. ¶ 103; *see, e.g. Cargill,* 479 U.S. at 104, 107 S.Ct. 484 (denying a plaintiff competitor standing to enjoin merger of two of its rivals on ground that it increased concentration among sellers because plaintiff could benefit by increasing its own prices). Rather, YES asserts that it is being driven from the markets, specifically, (1) of selling sports programming and buying broadcast rights and (2) of selling advertising time, by the alleged violations. It seeks damages to compensate for profits it would have earned by competing in the respective markets in the first place. *See* Compl. ¶ 126.[11] Irrespective of the team owners' or advertisers' injury, an excluded competitor like YES suffers a distinct injury if it is prevented from buying/selling its product. "[A] rival has clear standing to challenge the conduct of rival(s) that is illegal

---

**9.** The Supreme Court has directed that an antitrust plaintiff "should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

**10.** Monopoly power is defined "as the power to control prices in the relevant market or to exclude competitors." *Aspen Skiing Co. v.*

*Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596, n. 20, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

**11.** Cablevision asserts that YES' phrasing that it has suffered harm to reputation is not a cognizable antitrust injury. That may be so, but other claims in the complaint sufficiently allege that YES complains of being forced out of business and/or of being unable to compete for the purchase of broadcast rights. *See* Compl. ¶¶ 9, 10, 124–26.

precisely because it tends to exclude competitors from the market." 2 Areeda et al., *supra,* ¶ 348, at 387; Compl. ¶ 9 ("If Cablevision refuses to carry YES Network, Cablevision believes YES Network will fail and once again, Cablevision will be the only provider of local sports programming in the greater New York area, thus restoring its monopoly control of local sports programming."); *see also Andrx Pharmaceuticals, Inc. v. Biovail Corp. Intern.,* 256 F.3d 799 (D.C.Cir.2001) (finding standing is supported where alleged injury is not derived from or measured by the injury to consumers, but measured by the loss of profits [plaintiff] would have otherwise made had it not been excluded from the market); *Yellow Pages Cost Consultants, Inc. v. GTE Directories,* 951 F.2d 1158 (9th Cir.1991) (finding GTE's refusal to deal with plaintiff consultants directly injured consultants, who were found to compete with GTE for advertisers); *Sweeney v. Athens Regional Medical Center,* 709 F.Supp. 1563 (M.D.Ga.1989) (standing found for direct competitor of defendant in suit alleging defendant conspiracy to drive her from market by limiting access to patients). For similar reasons, that this creates a possible monopoly of "buyers" rather than "sellers" is not dispositive; YES has entered into the market as the direct competitor of Cablevision affiliates (MSG Network and FSNY) for the purchase of broadcast rights. Compl. ¶¶ 8–10.

In a related argument, Cablevision asserts that its dominance on the buyer's side can only result in an exit of a buyer and the accompanying decrease in selling prices and therefore constitutes a benefit, not detriment, to buyers such as YES. Def.'s Mem.Law at 18–19. Again, such an argument supposes that the only harms alleged in the Complaint are those on behalf of team owners and/or advertisers. Taking the facts in the Complaint as true, Cablevision's conduct was designed to en-sure its status as the only buyer in town, with its control of MSG and FSNY, and its pricing for the purchase of broadcast rights and sale of advertising time can be unilaterally determined, causing price distortions. Indeed, the exclusion of competitors would ensure that no one but Cablevision would in fact benefit from those lowered broadcast rights costs or elevated advertising rates. *Cf. Brunswick,* 429 U.S. at 489 n. 14, 97 S.Ct. at 698 n. 14 ("[C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened").

Accordingly, YES' allegations of injury to itself and competition which flow from Cablevision's purported exclusionary acts sufficiently alleges the type of injury the antitrust laws were intended to prevent in order to withstand the instant motion to dismiss. *See, e.g., Law Offices of Curtis V. Trinko v. Bell Atlantic Corp.,* 294 F.3d 307, 318–19 (2d Cir.2002) ("While the district court may find otherwise after discovery and a motion for summary judgment, it is too early to conclude on this record that the plaintiff only suffered a wholly derivative injury.").

2. *Suitability of Plaintiff: Local Broadcast Rights and Advertising Markets*

A showing of antitrust injury is necessary but not sufficient to establish antitrust standing, and a plaintiff may indeed have suffered an antitrust injury yet not be considered the proper plaintiff to bring an antitrust action. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). To determine whether a plaintiff is a proper antitrust plaintiff, courts have focused on whether there are more direct victims of the alleged antitrust violations, and whether the plaintiff can effectively repre-

sent the interests of such victims. *See, e.g., Huhta v. Children's Hosp. of Philadelphia,* 1994 WL 245454 at *2 (E.D.Pa. May 31, 1994). Put another way, where there exists "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," such persons, not one who has suffered a more indirect harm from the defendant's conduct, are the proper plaintiffs to bring an antitrust action. *Associated General Contractors,* 459 U.S. at 542, 103 S.Ct. 897. The doctrine of antitrust standing reflects the Supreme Court's attempt to articulate a test for recovery of treble damages pursuant to § 4 of the Clayton Act that will not "encompass every conceivable harm that can be traced to alleged wrongdoing." *Id.* at 536, 103 S.Ct. 897.

■ Cablevision's argument on this point can be summarized as follows. The main alleged antitrust violation by Cablevision is that it has "adamantly refused to carry YES Network on its cable systems, except on discriminatory and commercially unreasonable terms that it knows cannot be accepted by YES Network." Compl. ¶ 5. As such, Cablevision argues, the act of refusing to purchase and carry YES occurs only in the "regional sports programming" market. That YES' exit from this market as a competing Programming Service in turn has ripple effects, that is, *results in* weaker competition in the related "broadcast rights" market, Cablevision further argues, does not function to confer upon it automatic standing to challenge a purported monopoly in that related market. Def.'s Memo.Law at 3–6 ("Cablevision's alleged refusal to deal can harm YES only once: YES is not distributed on Cablevision's system only once and, for example, YES can go out of business only once. It does not go out of business three times—once in each of these markets.")

While Defendant's challenge has intuitive appeal, for indeed, there appears to be a dearth of cited acts other than the refusal to deal in the Complaint, there is no basis at this juncture of the case to find that a Plaintiff as a rival competitor alleging a distinct injury to competition and to itself in a defined market, lacks standing. The Second Circuit has found, in dicta, that "it is improper, in the absence of a valid business policy, for a firm with monopoly power in one market to gain a competitive advantage in another by refusing to sell a rival the monopolized goods or services he needs to compete effectively in the second market." *Berkey Photo v. Eastman Kodak Co.,* 603 F.2d 263, 284 (2d Cir.1979); *see Twin Laboratories v. Weider Health & Fitness,* 900 F.2d 566, 570–1 (2d Cir.1990) (finding *Berkey* required "tangible harm to competition" in second market); *cf. Virgin Atlantic Airways Ltd. v. British Airways,* 872 F.Supp. 52, 64 (S.D.N.Y.1994) (accepting leveraging claim absent an attempt to monopolize second market, provided there was an attempt to gain a competitive advantage in second market and injury amounting to "tangible harm to competition"); *International Audiotext Network, Inc. v. American Tel. & Tel. Co.,* 893 F.Supp. 1207 (S.D.N.Y.1994) ("The District Courts in the Second Circuit have adhered to *Berkey,* with the *Twin Labs* gloss [i.e. requiring tangible harm to competition]"); *Viacom Intl. v. Time,* 785 F.Supp. 371 (S.D.N.Y.1992) (accepting monopoly leveraging claim involving cable system operators who obtained anticompetitive advantage in adjacent market for cable programming).

Most recently, the Second Circuit has found that to allege a monopoly leveraging claim, the plaintiff must show that the defendant: (1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage ... in another

distinct market; and (3) caused injury by such anticompetitive conduct. *Law Offices of Curtis Trinko v. Bell Atlantic*, 294 F.3d 307, 326 (2d Cir.2002). Also instructive on the issue of leverage claims is the following admonition:

> Offsetting [the prevention of monopolies] is [the] fear that many leverage claims are really complaints about the defendant's greater efficiency or aggressiveness and [the] willingness to turn the antitrust laws into a statute that protects firms from 'unfair' but non-monopolistic practices. Thus, any monopoly leveraging claim must be limited to circumstances where (1) the 'target' (B) market is properly defined; and (2) the alleged conduct threatens the B market with the higher prices or reduced output or quality associated with the kind of monopoly that is ordinarily accompanied by large market share. If the (2) requirement is met, then one literally does not need a distinctive 'leveraging' doctrine—an action that yields monopoly performance in the B market could be regarded as 'monopolization' or 'attempt to monopolize' within the literal language of § 2, notwithstanding that it fails to yield a monopoly market share. But courts must then take great care not to permit the (2) requirement to be satisfied with such alternative formulations as 'unfairness,' 'competitive advantage,' or 'distorting competition' in the leveraged market. The gravamen of the offense is not the enlargement of the defendant's market share at the plaintiffs' expense or even the destruction of plaintiffs by unfair means. Rather, it must be monopoly market performance measured by reduced output or higher prices in the secondary market.

3 Areeda et al., *supra*, § 652 at 97.

Accordingly, the focus of a court's review must be whether the Complaint alleges that the related broadcast rights and advertising (secondary) markets are faced with the requisite threats of "higher prices or reduced quality" associated with monopolies or attempted monopolies. Here, the Plaintiff has adequately alleged that Cablevision's monopoly in the regional sports programming market has been leveraged in the secondary markets of broadcast rights and advertising and caused price distortions consistent with a "tangible harm to competition". *See, e.g., Law Offices of Curtis v. Trinko*, 294 F.3d at 326 (holding plaintiff's allegation that defendant used monopoly power in wholesale market to gain a "competitive advantage" in downstream retail market is a cognizable monopoly leveraging claim which survives a motion to dismiss); *see also* 3 Areeda et al., ¶ 652 at 96 (in discussing monopoly leveraging: "[T]he plaintiff might claim that the defendant uses monopoly power in A to place rivals in B at a competitive disadvantage, perhaps by raising their costs or making their offerings less attractive.") Again, Cablevision may ultimately be able to refute these claims on summary judgment, but the Court is unable to resolve them on the instant motion.

Finally, other potential plaintiffs, that is the other teams not owned by Cablevision who are sources of programming rights and advertisers seeking to buy time on regional sports programming services, are not necessarily more efficient antitrust plaintiffs than the rivals who are alleging exclusion in the first instance. Unlike cases involving indirect purchasers, YES is a direct participant and competitor in the alleged markets affected.

■ Accordingly, Defendant's motions to dismiss Plaintiff's § 2 claims in the broadcast rights and advertising markets

on the basis of standing are DENIED.[12]

### 2. Antitrust Injury and Standing: Vertical Integration

■ For reasons similar to those discussed above, YES also has standing to claim in Count VII that Cablevision's acquisition of a "controlling interest" in Madison Square Garden, L.P., violated § 7 of the Clayton Act by conferring on Cablevision control over the broadcast rights licensed to MSG and FSNY and control over the New York Knicks and New York Rangers, i.e., "all locally broadcast games of all professional baseball, hockey, and basketball teams in the New York Area". Compl. ¶ 158. Cablevision's argument that YES cannot challenge a vertical integration because YES has managed to enter into the market and thereby cannot challenge entry barriers for others mischaracterizes the alleged injury.

■ In a Section 7 analysis of vertical mergers, the competitive significance of a vertical merger results primarily from the degree, if any, to which it may increase barriers to entry into the market or reduce competition by (1) foreclosing competitors of the purchasing firm in the merger from access to a potential source of supply, or from access on competitive terms, (2) foreclosing competitors of the selling firm from access to the market or a substantial portion of it, or (3) forcing actual or potential competitors to enter or continue in the market only on a vertically integrated basis because of advantages unrelated to economies attributable solely to integration. See Fruehauf Corp. v. F.T.C., 603 F.2d 345, 352 (2d Cir.1979); see also Standard Oil Co. of California v. United States, 337 U.S. 293, 314, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) ("The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition, [which] deprive(s) ... rivals of a fair opportunity to compete.' H.R.Rep. No. 1191, 81st Cong., 1st Sess. 8" (footnote omitted)). YES, therefore, has standing to assert that the acquisition has deprived it of a fair opportunity to compete in a market it has already entered. See, e.g., Rebel Oil Co. v. Atlantic Richfield, 957 F.Supp. 1184, 1195, 1202 (9th Cir.1997) ("The fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers. If the output or capacity of the new entrant is insufficient to take significant business away from the predator, they are unlikely to represent a challenge to the predator's market power."); Six West Retail Acquisition, Inc. v. Sony Management Corp., 97 cv 5499, 2000 WL 264295, at *25 (S.D.N.Y. March 9, 2000) (finding sufficient standing and antitrust injury for a § 7 claim where merger presented Defendants with an avenue through which they could thwart

---

**12.** While the Court has found that the allegations in the Complaint, taken as a whole, describe conduct that support standing for an antitrust claim under a number of theories, as discussed *supra* and *infra*, the Court is cognizant of Defendant's point that there is no separate Count for an attempted monopolization or monopoly leveraging of the market for the sale of advertising. For the purposes of clarity, Plaintiff, should it decide to pursue such a claim, shall file an amended complaint which explicitly sets all surviving claims pursuant to this Opinion, out in separate Counts. In amending, Plaintiff should also be cognizant of the Second Circuit's admonition in *Law Offices of Curtis Trinko* that monopoly leveraging claims are distinct from attempted monopolization claims, 294 F.3d at 326 n. 13, and should state its claims clearly and succinctly so that Defendant may answer them as such. In answering, Defendants should correlate its responses to Plaintiff's enumerated Counts.

Plaintiff's and other exhibitors' access to movies). Accordingly, Defendant's motion to dismiss Count VII is DENIED.

## C. Essential Facilities Doctrine

A refusal to grant access to an essential facility[13] violates the antitrust laws because of the danger that a monopolist in one market might use its market power to extend its monopoly into another. *See MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132–33 (7th Cir.1983) ("monopolist's control of an essential facility (sometimes called a 'bottleneck') can extend monopoly power from one stage of production to another, and from one market into another.").

To state a claim under the essential facility doctrine, a plaintiff must allege: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 569 (2d Cir.1990). Here, Count III alleges that the essential facility is the distribution system by which Cablevision delivers programming to its franchise area subscribers. *See* Compl. ¶¶ 129–30. YES further alleges that it cannot practically or reasonably duplicate the essential facility due to significant barriers to entry (¶¶ 131–132), and that it is feasible for

Cablevision to provide access to the facility to YES (¶¶ 133–34).

Cablevision's objections center around the third prong and regard what circumstances actually constitute a "denial" in the use of a facility. Specifically, Cablevision argues the essential facility doctrine does not enable YES (1) to force access when YES already has access pursuant to the leased access provisions of the Cable Act, 47 U.S.C. § 532; (2) to force Cablevision to purchase products or services from YES as opposed to forcing Cablevision to permit YES to use a facility; and (3) to obtain better treatment than its competitors. Def.'s Mem.Law at 26.

The only question before the Court is whether, as a matter of law, the essential facility doctrine encompasses cases where the alleged monopoly refuses to pay a "reasonable price" to carry the challenger's service on its facility. The Supreme Court's decision in *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1513 (1984), does not hold that a monopolist must make a facility available at a competitive rather than monopolistic price.[14] Indeed, such a ruling has great logical appeal, given that such determinations of "reasonable price" made by any court can often be Sisyphean undertakings—"nothing less than price regulation of the kind undertaken by regulatory agencies—something for which both the federal courts and the antitrust litigation process are extremely ill-suited and which is, in any event, inconsistent with anti-

---

13. The Second Circuit has stated that essential facilities include: " 'facilities that are a natural monopoly, facilities whose duplication is forbidden by law, and perhaps those that are publicly subsidized and thus could not practicably be built privately.' *Most of the successful essential facility claims fall within* [these] categories ... In cases finding liability in other categories, however, the facility in question was more than dominant; it was effectively the only one in town." *Twin Labs.,*

*Inc. v. Weider Health & Fitness*, 900 F.2d 566, 569 (2d Cir.1990) (quoting Areeda & Hovenkamp, ¶ 736.2 (Supp.1998)).

14. While the Supreme Court, unlike the Tenth Circuit, did not rely on the essential facilities doctrine, the case is concerned with a vertical integration and is often cited in lower court cases involving alleged essential facilities. *See, e.g., Areeda & Hovenkamp*, § 772c at 182.

trust's fundamental 'market' orientation to problems of lack of competition." Areeda et al., § 771 at 172; cf. *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 n. 3 (5th Cir.1979) (court should not "be called upon to weld together two business entities which have shown a propensity for disagreement, friction, and even adverse litigation").

Nevertheless, the Second Circuit in *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 179–80 (2d Cir. 1990), found that "there need not be an outright refusal to deal in order to find that denial of an essential facility occurred. It is sufficient if the terms of the offer to deal are unreasonable." Defendant may ultimately be able to delineate a "legitimate business practice" (e.g., where YES should be required to lease the distribution system[15]) which would shield defendant from liability for conduct that otherwise would constitute denial of an essential facility. *See MCI Communications v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir.1983). This Court, however, cannot resolve this issue on the merits at this stage of the litigation. *See, e.g., Law Offices of Curtis v. Trinko*, 294 F.3d at 326 (finding that whether facility is essential and/or what constitutes reasonable access

are "issues of fact that cannot be resolved on this motion to dismiss."). *Cf. Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir.1996) (finding, on summary judgment, no denial to essential facility where defendant charged plaintiff prices significantly above market); *Florida Mun. Power Agency v. Florida Power and Light Co.*, 81 F.Supp.2d 1313 (M.D.Fla.1999) (finding, on summary judgment, essential facility not violated where Defendant provided access, but not on plaintiff's desired terms).

In light of such clear precedent, Cablevision's reliance on *International Audiotext v. American Telephone & Telegraph Co.*, 62 F.3d 69 (2d Cir.1995) is unavailing. There, the Second Circuit found that the essential facility doctrine was not implicated because the case did not involve a facility, but a service, specifically, a phone company's "billing services." Id. at 71. That is not the case here, where there is no law to support Cablevision's allegations that its distribution network is not a facility or that the fact YES is seeking to sell its service (and thus forcing Defendant to buy) makes the claim noncognizable under the essential facilities doctrine.[16] Further, the direction of pay-

---

**15.** The Court is aware of the intent behind the leased access provisions, 47 U.S.C. § 532 (2002) where: "Leased access is aimed at assuring that cable channels are available to enable program suppliers to furnish programming when the cable operator may elect not to provide that service as part of the program offerings he makes available to subscribers." S.Rep. No. 102–92, at 29 (*quoting* H.R.Rep. No. 98–934, at 47 (1984)). Nevertheless, the key question remains whether forcing YES to lease a system for which Cablevision pays its affiliates constitutes a competitive injury accompanied by high entry barriers such that competition in the marketplace is impaired. Absent such impairment, it could very well be that YES is simply an unintegrated rival whose injury reflects nothing more than Cablevision's ability to reduce its costs without

the concomitant injury to competition. However, for the purposes of this motion, YES' allegation that Cablevision has refused to deal in terms which are reasonable in order to keep its monopolistic position from eroding is taken as true.

**16.** Simply re-characterizing YES' attempted access claim as an attempt to sell a service cannot result in a dismissal where YES' allegations meet the threshold requirements under the essential facilities doctrine and YES is entitled to all facts construed in its favor at this juncture. That is not to say, however, that the record at summary judgment would not permit this Court to find the essential facilities doctrine unavailable because the distribution system cannot be fairly characterized as a "facility" or where the mode of pay-

ment (i.e. liability attaches only where a plaintiff must pay for access to a facility not vice versa) plays no part in determining the applicability of the doctrine, except in the determination of reasonableness of the access arrangement. Said determination, as discussed above, cannot be made at this stage of the litigation.[17] Accordingly, Cablevision's request to dismiss Count III is DENIED.

### D. Tying Claim and FCC Violations

YES alleges that Cablevision is bundling its Internet service with its video programming services at discounted prices to increase switching costs for subscribers who might consider switching to DBS (or other MVPD operators) and that Internet service, thus, is the tying[18] product. *See* Compl. ¶¶ 14, 41. Cablevision argues that YES' "tying claim" should be dismissed for lack of standing and for failure to plead a required element of the claim. Def.Mem.Law at 21–3, 29. Cablevision further asserts that YES "can neither directly bring a claim to enforce these

FCC regulations nor indirectly adopt these regulations as a standard to be applied in determining its antitrust claims." Def. Mem.Law at 30. YES responds that YES is not bringing a "tying claim," or a claim to enforce FCC regulations (Pl.'s Mem. Law at 33) and accordingly, it appears that the only issue for the Court to decide at this juncture is whether to strike any allegation of tying or FCC violations from the Complaint as irrelevant. YES treats Cablevision's motion as a motion to strike pursuant to Fed.R.Civ.P. 12(f) and argues a determination of relevance at this stage would be premature. Cablevision treats the allegations as "abandoned claims" and argues they should be stricken under Fed. R.Evid. 404(b) as impermissible character evidence.

When sought to expunge irrelevant factual matters, a strike motion will not be granted unless those matters have no clear bearing on the issues in dispute. *Reiter's Beer Distributors, Inc. v. Schmidt Brewing Co.*, 657 F.Supp. 136, 143 (E.D.N.Y.1987). Accordingly, a motion to

---

access offered by Cablevision is not so patently unreasonable by industry standards to constitute a "denial."

**17.** Defendant relies on *Paladin Assocs., Inc. v. Montana Power Co.*, 97 F.Supp.2d 1013, 1038 (D.Mont.2000) for the proposition that the essential facilities doctrine is unavailable to a plaintiff seeking "preferential treatment" over its competitors. *Paladin*, however, found simply, after discovery was conducted, that plaintiff failed to sustain a "denial to facility" claim since it was engaged in an active contract with defendant, though on terms not to its liking. *Id.* at 1038. Those facts are clearly not mirrored here, where plaintiff alleges a denial associated with Cablevision's status as a vertically integrated monopolist in the cable distribution market. Further, *Paladin* is of limited value because it involved a combination in restraint of trade, not single firm conduct. As such, Sherman Act ramifications are quite different for combinations versus individuals. *See Copperweld*, 467 U.S. at 767–

69, 774–77, 104 S.Ct. 2731 (while a combination may be liable for effecting a mere restraint of trade, for a single firm to be liable there generally must be either monopolization or the threat of monopolization).

**18.** Proof of a tying arrangement generally requires evidence that the supplier's sale of the tying product is conditioned upon the unwilling purchase of the tied product from the supplier or an unwilling promise not to purchase the tied product from any other supplier. *See, e.g., Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. 1551 ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); *Wells Real Estate*, 850 F.2d at 814 ("Tying arrangements involve the use of leverage over the market for one product ... to coerce purchases of a second product....").

strike will be granted if the disputed matter "is irrelevant under any state of facts which could be proved in support of the claims being advanced." *Id.*

While the Court is skeptical that bald allegations of tying in another product/geographic market would have any relevance to the issues here (including Defendant's intent), it is a question better left to more advanced stages of this lawsuit. Indeed, the only Second Circuit case cited by Defendant was a determination made at trial, where the Court had the benefit of a developed record in order to analyze whether the proffered evidence was improper "character" evidence or evidence which properly went to intent or pattern. *See United States Football League v. National Football League*, 842 F.2d 1335, 1371 (2d Cir.1988) (assessing relevance of prior antitrust judgments at trial) [19].

The Plaintiff capitulates that the alleged FCC violations do not comprise an independent cause of action, but merely informs the standard of competitive conduct. Pl.'s Mem.Law at 34. There is no allegation in the Complaint that the FCC has determined that any violation has occurred. The Court is also aware that the FCC standards are not amendments to the existing federal antitrust laws. In the absence of relevant authority to the contrary, however, the standards developed by this industry's regulatory agency (i.e. the FCC), while not binding or necessarily

persuasive authority, may be relevant. *See, e.g., Int'l Audiotext Network, Inc.*, 893 F.Supp. at 1212 (noting court may take judicial notice of materials publicly filed by or with the Federal Communication Commission as "giving an indication of the nature of relevant practices in and policies affecting the ... business.") (*citing Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991)).

Accordingly, Defendant's motions to strike are DENIED at this time.

## E. Donnelly Act

 The Donnelly Act, N.Y.Gen. Bus.Law § 340, proscribes that "[e]very contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. N.Y.Gen.Bus.Law § 340(1). The Act was closely patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act. *See State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976) (concluding that price discrimination claim falls outside the ambit of the Sherman Act and therefore, the Donnelly Act); *see also Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton*, 997 F.Supp. 340 (E.D.N.Y.1998) (finding Donnelly Act is modeled after the Sherman Antitrust Act and is generally

---

19. Comparisons of the instant matter to the other cases cited by Defendant are misplaced. *3 Penny Theater Corp. v. Plitt Theatres, Inc.*, 1985 WL 5138, at *1 (N.D.Ill. November 25, 1985), struck almost 30–year–old antitrust convictions, where the Plaintiff admitted it was relevant to the claims only to establish defendants' 'corporate character'. *Tivoli Realty v. Paramount Pictures*, 80 F.Supp. 800, 804 (D.C.Del.1948), struck a paragraph in the Complaint alleging the violation of another judicial decree as immaterial, but denied the striking request as to paragraphs which "fur-

nished background material as to the nature, extent and character of the alleged conspiracy." *In re Potash*, 1994 WL 1108312 at *6 (D.Minn.1994) found that any potential relevance of the allegations of decades-old previous misconduct was substantially outweighed by their likelihood for prejudice. Further, the *Potash* Court declined to strike a description of conduct which was in close proximity to the Plaintiff's claims and "provide[d] a setting for the events which, the Plaintiffs contend, spawned the conduct that they assert as unlawful." *Id.* at *7.

interpreted in accordance with federal precedent). A party asserting a violation of the Donnelly Act must (1) identify the relevant product market, (2) describe the nature and effects of the purported conspiracy, (3) allege how the economic impact of that conspiracy is to restrain trade in the market in question, and (4) show a conspiracy or reciprocal relationship between two or more entities. *Great Atlantic & Pacific Tea Co., Inc.,* 997 F.Supp. at 352.

Cablevision argues that the Donnelly Act cannot be implicated, absent allegations of conduct between one or more actors (hence, the "arrangement" and "combination"), and as such, cannot apply to YES' allegations of single firm, vertical conduct. Def.'s Mem.Law at 29–30; Reply at 14–15. YES responds that the Act is broad enough to prohibit "vertical restraints" and that, regardless, YES alleges a "combination and arrangement between Cablevision and its affiliate MSG LP ... as well as supporting acts that seek to restrain competition ..." Pl.'s Mem.Law at 28–30.

■ The Supreme Court has found that a parent corporation and its wholly-owned subsidiary are incapable of conspiring with each other due to a presumed unity of purpose. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The central issue is whether an alleged conspiracy between Cablevision and its affiliated MSG LP (which owns MSG and FSNY sports networks) constitutes a "combination and arrangement" sufficient

to fall under the Donnelly Act.[20] While YES devotes much of the Complaint to alleging that Cablevision is a vertically integrated entity which utilizes its subsidiaries (i.e. CSC Holdings) and its controlling interest in its affiliates as a single force to eject YES from several related markets[21], here, Cablevision argues that they are indeed separate entities: "[W]ith less than 47% ownership of MSG and FSNY, [Cablevision] does not have sufficient ownership to fall either under *Copperweld* or outside the scope of New York's Donnelly Act." Pl.'s Mem.Law at 30. YES cannot have it both ways.[22] Indeed, the *Copperweld* inquiry is more substantively about determining whether there existed control and a so-called "unity of purpose" rather than the establishment of any magic number percentage of ownership. *See generally Copperweld* at 767–778, 104 S.Ct. 2731.

■ More importantly, conclusory allegations of conspiracy are legally insufficient to make out a violation of the Donnelly Act. *Sands v. Ticketmaster–New York, Inc.,* 207 A.D.2d 687, 616 N.Y.S.2d 362, 364 (1st Dep't 1994). Plaintiff alleges no facts to suggest that Cablevision's refusal to carry YES on reasonable, nondiscriminatory terms (Compl.¶ 167–168) or "control" of the Knicks and Rangers (Compl.¶¶ 8, 48, 162), was the product of a conspiracy or reciprocal arrangement, as opposed to a unilateral act by Cablevision that may have inured to the benefit of FSNY and MSG. *Great Atlantic & Pacific Tea Co., Inc.,* 997 F.Supp. at 352 (finding plaintiff's

---

**20.** YES' vague and conclusory allegation of coercion as to some "national non-networked advertising cooperative" is a wholly insufficient basis for a Donnelly Act claim.

**21.** YES alleges: "Cablevision has owned a majority interest in FSNY for many years; in 1995, after several years of effort, Cablevision

acquired a 50% interest in MSG, and acquired a controlling interest in 1997" Compl. ¶ 7.

**22.** Notably, YES did not bring a claim of federal antitrust conspiracy under § 1 of the Sherman Act, 15 U.S.C. § 1.

conclusory allegation regarding conspiracy insufficient to state a claim).

Plaintiffs relies on *Anheuser–Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 525 N.Y.S.2d 816, 819, 520 N.E.2d 535 (1988) for the proposition that "vertical restraints on trade if demonstrated to be unreasonable" clearly fall under the Donnelly Act. Pl.'s Mem.Law at 28. *Anheuser–Busch*, however, is a case involving purportedly illegal agreements to eliminate intrabrand competition, made between *two* separate economic entities, beer brewers and designated wholesalers in a given territory, "not to sell the brewer's products outside that territory or to anyone inside the territory who would resell the products elsewhere." *Id.* at 818. As such, these agreements, which operated to restrain trade vertically, clearly fell under the Donnelly Act. *Anheuser–Busch*, however, has no application here where the allegations relate to a network of subsidiaries and affiliates created by one vertically integrated corporation. Further, reliance on *People v. Schwartz* is also misplaced, where the state court did not need to decide the issue of *Copperweld's* applicability "because the indictment charges conspiracy with two people ... and this second person has no relationship with defendant or his corporation." *People v. Schwartz*, Index No. 1557/86, 1986 WL 55321 (N.Y.Sup.Ct. Oct. 17, 1986).

Accordingly, Defendant's motion to dismiss the Donnelly Act claim (Count VIII) is GRANTED.

### III. CONCLUSION

For the reasons stated above, the Court denies Defendant's motion to dismiss with the exception of Defendant's motion as to Count VIII, the Donnelly Act claim, which is granted.

Plaintiff shall file an amended complaint in accordance with this Opinion (see n. 12 *supra*) by September 24, 2002. Defendant shall respond by October 14, 2002.

SO ORDERED.